**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| ROBERT R. MEHDIZADEH and MAMALILLI, LLC,<br>*Plaintiffs*,<br>v.<br>THE TALARIA COMPANY, LLC d/b/a HINCKLEY YACHT SERVICES,<br>*Defendant*. | C.A. No.:<br>JURY TRIAL DEMANDED |

**COMPLAINT AND JURY DEMAND**

Plaintiffs Robert R. Mehdizadeh ("Mr. Mehdizadeh") and Mamalilli, LLC ("Mamalilli"), by and through undersigned counsel, bring this Complaint against Defendant The Talaria Company, LLC d/b/a Hinckley Yacht Services ("Hinckley" or "Defendant"), and allege as follows:

**NATURE OF THE ACTION**

1. This is an action arising from Hinckley's sale of a materially defective 40-foot recreational vessel—the 2023 Hinckley Sport Boat 40X named LILLI (the "Vessel")—and its subsequent failure to cure a serious defect in the Vessel's hull, despite a written lifetime hull warranty and repeated assurances of repair attempts. Plaintiffs bring claims under the Magnuson-Moss Warranty Act, for breach of express and implied warranty, revocation of acceptance, breach of the maritime implied warranty of workmanlike performance, unjust enrichment, and seek rescission of the purchase, return of the full purchase price, consequential and incidental damages, and attorneys' fees.

## PARTIES

2. Plaintiff Robert R. Mehdizadeh is a citizen of the State of California. He is a member and a manager of Plaintiff Mamalilli, LLC.

3. Plaintiff Mamalilli, LLC is a limited liability company organized under the laws of the State of Colorado and is member-managed. Its only members are Mr. Mehdizadeh and James Nourollah Mehdizadeh. Each member is a natural person and a citizen of the State of California.

4. Defendant The Talaria Company, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at One Little Harbor Landing, Portsmouth, Rhode Island 02871. It does business under the assumed names "The Hinckley Company" and "Hinckley Yacht Services," and issued the Hull Warranty described below in the name of "The Talaria Company, LLC d/b/a The Hinckley Company." Upon information and belief, no member of Hinckley is a citizen of the State of California.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over Count I pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 2310(d), as the amount in controversy exceeds $50,000, exclusive of interest and costs.

6. This Court has supplemental jurisdiction over Counts II through VII pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy as the claim in Count I.

7. This Court has diversity jurisdiction over each Count of this Complaint, independent of federal question and supplemental jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1). Complete diversity of citizenship exists between Plaintiffs, each of whom is a citizen of the State of California for purposes of diversity jurisdiction, and Defendant, no member of which is a citizen

of the State of California. The amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Hinckley resides and conducts substantial business in this District, and a substantial part of the events giving rise to the claims herein occurred in Rhode Island.

9. Venue in this District is independently proper, and Hinckley has consented to personal jurisdiction and venue in this District, pursuant to Section 17 of the Terms and Conditions incorporated into the Purchase Agreement, which provides that the Agreement is governed by Rhode Island law and that any claim arising thereunder shall be brought only in the state courts of Rhode Island or in the United States District Court for the District of Rhode Island.

## FACTUAL ALLEGATIONS

### The Purchase of the Vessel

10. Beginning in or around September 2021, Mr. Mehdizadeh, through Mamalilli, contracted with Hinckley for the construction and purchase of the Vessel, a new 2023 Hinckley Sport Boat 40X to be named LILLI.

11. The Vessel, which was supposed to be delivered December 12, 2022, was ultimately delivered July 24, 2023.

12. Hinckley designed, manufactured, marketed, and sold the Vessel to Mamalilli and Hinckley is the entity that issued the written lifetime hull warranty described below.

13. Mr. Mehdizadeh negotiated the purchase of the Vessel with Hinckley, directed and funded the payments made to Hinckley, and took delivery of the Vessel.

14. He thereafter used the Vessel—albeit only very sparingly, due to Hinckley's failures as further described herein—for his own personal and family recreational purposes and conducted all of the warranty, inspection, and repair dealings with Hinckley described below.

15. At all times relevant hereto Mr. Mehdizadeh acted both in his individual capacity and on behalf of and as agent for Mamalilli.

16. Mamalilli is a holding entity formed for the sole purpose of taking and holding title to the Vessel.

17. Mamalilli acquired the Vessel new, from Hinckley, primarily for the personal and family use and enjoyment of its two members and their families, and not for resale, charter, or any commercial or business purpose.

18. The purchase of the Vessel was a consumer transaction. The Vessel is new goods that were purchased primarily for the personal and family purposes of Mr. Mehdizadeh and his family, and not for resale, charter, or any commercial or business purpose.

19. Hinckley, by contrast, is a commercial designer, manufacturer, and seller of vessels, which drafted the contract documents and the hull warranty described below and dictated their terms.

20. Plaintiffs made the following progress payments to Hinckley toward the purchase price of the Vessel: (a) $216,000 on or about September 20, 2021; (b) $579,490 on or about October 20, 2022; (c) $350,000 on or about January 12, 2023; and (d) $359,400 on or about February 28, 2023, for a total of $1,504,890.

21. On or about March 30, 2023, Hinckley issued a closing letter and final invoice reflecting a total contract price of $1,675,910, consisting of a $1,440,000 base price, $231,140 in

fixed-price options, and $4,770 for transport of the Vessel to Rhode Island, with a remaining balance of $171,020 due by April 17, 2023.

22. Plaintiffs paid the remaining balance, and closing and delivery of the Vessel occurred on or about April 17, 2023.

23. The Vessel was thereafter registered with the United States Coast Guard in the name of Mamalilli, LLC, Hull Identification Number US-THC4X026D323, and Mamalilli has at all times since been the record owner of the Vessel.

24. The Vessel is registered with the United States Coast Guard as a recreational vessel, has at all times been used (when usable) exclusively for recreational boating, and has never been placed in commercial service or held out for hire.

**<u>Post-Delivery Engine and Steering Defects</u>**

25. The Vessel was delivered with twin 600-horsepower Mercury V12 Verado outboard engines, which Hinckley selected, installed, commissioned, and delivered as component parts of the Vessel.

26. Beginning immediately after delivery, the Vessel experienced repeated failures of the electronic steering sensors associated with those engines.

27. On or about May 31, 2023, Hinckley's Quality Manager advised Mr. Mehdizadeh in writing that Mercury would be examining the steering system on the Vessel's port engine the following week, and that once the steering issue had been resolved Hinckley would return the Vessel to its production department to address the remainder of the Vessel's outstanding punch list.

28. On or about June 7, 2023, Hinckley's Outboard Operations Manager advised Mr. Mehdizadeh in writing that Mercury had acknowledged that steering sensor failures were a known

issue across its 600 engine line; that there was no serial number range by which potentially defective sensors could be identified in advance; and that a replacement sensor was the same product as the sensor originally installed, and was therefore no less susceptible to failure than the part it replaced.

29. Thereafter, a Mercury technician attended the Vessel at Hinckley's facility in Southwest Harbor, Maine, and serviced the steering sensor. Hinckley elected to replace both of the Vessel's steering sensors at that time in an effort to prevent future failures.

30. Notwithstanding the replacement of both steering sensors in June 2023, the steering and control problems recurred. In or about November 2023, while the Vessel was in Hinckley's care in Stuart, Florida, a Hinckley sales representative operating the Vessel experienced a fault in the Vessel's joystick control system while docking the Vessel.

31. A diagnostic report subsequently pulled from the Vessel confirmed the fault, and Hinckley advised Mr. Mehdizadeh that the Vessel's steering sensors would have to be replaced a second time.

32. Due to the recurring steering and control failures described above, Mr. Mehdizadeh did not have confidence in the Vessel and was never comfortable operating it.

33. Mr. Mehdizadeh used the Vessel for approximately one month during the summer of 2023.

34. The engine, steering, and control defects described in this section are pled as background. Plaintiffs assert no separate claim for relief arising out of those defects. Those defects are alleged because they bear on the condition of the Vessel as delivered, the limited extent to which Plaintiffs were able to use the Vessel, and the substantial impairment of the value of the Vessel to Plaintiffs.

**<u>The Hull Warranty</u>**

35. The Purchase Agreement identifies among its attachments the "Hinckley Sport Boats Limited Warranty dated May 8, 2018" (the "Hull Warranty"), which Hinckley drafted and issued. A true and correct copy of the Purchase Agreement, together with the Terms and Conditions and the attachments referenced on its face, including the Hull Warranty, is attached hereto as Exhibit A and incorporated herein by reference.

36. By the terms of the Hull Warranty, Hinckley warrants to the original Buyer of the Vessel (Mamalilli) that the hull and deck structure will be free from defects due to substandard material or workmanship under conditions of normal recreational consumer use and service, and further provides that the warranty on the hull and deck structure shall be in force and effect for as long as the original Buyer owns the Vessel.

37. Hinckley has repeatedly acknowledged the existence and applicability of the Hull Warranty in written correspondence concerning the defect described below.

38. For example, on or about June 12, 2026, Andrew Barksdale, Hinckley's Interim Chief Operating Officer, advised Mr. Mehdizadeh in writing that a Hinckley production specialist from its Maine facility would supervise the hull repair specifically in order to preserve the Hull Warranty.

39. At no point during the more than four months of repair efforts described below did Hinckley deny that the hull defect was covered by the Hull Warranty, contend that the Hull Warranty had lapsed or been voided, or decline to perform repairs on the ground that the Hull Warranty did not apply.

40. Mr. Mehdizadeh is a person whom Hinckley could reasonably expect to use the Vessel, and he has at all times been its user.

**Discovery of the Hull Defect**

41. In or about March 2026, in connection with a prospective resale of the Vessel, a sea trial and survey were conducted.

42. On or about March 15, 2026, a marine surveyor performed a pre-purchase and valuation survey, including infrared thermal imaging, and discovered moisture anomalies in the port-forward side of the hull below the waterline, in the vicinity of the bow thruster, consistent with water intrusion into the outer skin laminate and foam core of the hull.

43. Hinckley undertook to remediate the defect at its Hinckley Yacht Services boatyard facility in Stuart, Florida.

44. On or about April 29, 2026, a second infrared and moisture-meter inspection was performed at that facility.

45. That inspection documented continuing substantial moisture in the hull laminate, foam core, and structural kerfs; holes cut into the port hull to inspect and drain water, from which approximately two to three gallons of water were drained; and carbon-fiber matting in the forward bilge that had been sanded away, exposing voids and air pockets in the structure.

46. The surveyor recommended either continued moisture extraction or replacement of the affected core material.

47. On or about May 3, 2026, the prospective buyer who had commissioned the March and April 2026 surveys forwarded the survey findings to Hinckley Yacht Services personnel and to Mr. Mehdizadeh, stated his view that the water-logged hull was directly and proximately caused by negligent manufacturing by Hinckley, criticized the pace of Hinckley's repair efforts, and withdrew his offer to purchase the Vessel.

48. As a direct result of the hull defect and Hinckley's failure to timely remediate it, the prospective sale of the Vessel fell through, and the Vessel has been rendered unusable and unmarketable since on or about March 2026.

**<u>Hinckley's Failed Repair Efforts</u>**

49. On or about May 26, 2026 and again on or about July 10, 2026, at Plaintiffs' request and expense, further inspections of the Vessel's hull were performed at the Hinckley Yacht Services facility to assess the effectiveness of Hinckley's repair efforts.

50. On or about June 10, 2026, Stephanie Robertson, General Manager of Hinckley Yacht Services, advised Mr. Mehdizadeh in writing that additional areas of elevated moisture had been discovered beyond the area originally identified, and that Hinckley intended to open the entire area of concern and grind the hull to the core for inspection and drying.

51. On or about July 10, 2026, a fourth inspection of the Vessel was performed directly for Plaintiffs at the Hinckley Yacht Services facility.

52. That inspection found that, while the hull's foam core was then largely dry, a water-stained and structurally degraded area of core approximately five feet by two feet remained, with some areas of hardened, essentially impenetrable resin and other areas of soft, easily-penetrated and compromised resin—evidence of lasting structural degradation notwithstanding the drying.

53. The inspection further found that the carbon-fiber bilge voids first identified in April 2026 remained unrepaired.

54. As of the filing of this Complaint, more than four months after the hull defect was first discovered and reported to Hinckley, and notwithstanding numerous representations by Hinckley that repairs were underway or complete, the Vessel's hull has not been fully and properly

repaired in accordance with the Hull Warranty and remains diminished in value and impaired in its seaworthiness and merchantability.

55. Contemporaneously with the filing of this Complaint, Mamalilli, through its counsel, delivered to Hinckley a written notice of revocation of acceptance pursuant to R.I. Gen. Laws § 6A-2-608. That notice advised Hinckley that, by reason of the hull defect described above and Hinckley's failure to cure it, Mamalilli revokes its acceptance of the Vessel, and demanded return of the purchase price paid.

56. The Vessel has remained continuously in Hinckley's possession and control since delivery, with the exception of one month during the summer of 2023, and has at all times since been, and remains, at Hinckley's disposition.

**COUNT I**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(By Both Plaintiffs Against Defendant)**

57. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

58. The Vessel is a "consumer product" within the meaning of 15 U.S.C. § 2301(1), in that it is tangible personal property distributed in commerce that is normally used for personal or family purposes.

59. Recreational vessels of the kind Hinckley designs, builds, markets, and sells are normally used for personal and family recreation.

60. Each Plaintiff is a "consumer" within the meaning of 15 U.S.C. § 2301(3).

61. Neither Plaintiff acquired the Vessel for purposes of resale.

62. The Hull Warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

63. Hinckley drafted and issued the written instrument embodying the Hull Warranty and dictated its terms.

64. The Hull Warranty is attached hereto as part of Exhibit A, and its terms, coverage, and duration are as set forth therein.

65. Hinckley breached the Hull Warranty by failing to repair the hull defect described above within a reasonable time and after a reasonable number of attempts, and further breached the implied warranties arising under state law, which the Magnuson-Moss Warranty Act incorporates and which Hinckley could not disclaim having given a written warranty in connection with the sale of a consumer product.

66. Plaintiffs have afforded Hinckley a reasonable opportunity to cure its breach, including by permitting more than four months of repair attempts at Hinckley's own facility, and any further opportunity to cure would be futile.

67. Pursuant to 15 U.S.C. § 2310(d), Plaintiffs are entitled to damages and equitable relief, including rescission and refund of the purchase price, as well as their costs and reasonable attorneys' fees incurred in this action.

## COUNT II
## BREACH OF EXPRESS WARRANTY
## (R.I. Gen. Laws § 6A-2-313)
## (By Both Plaintiffs Against Defendant)

68. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

69. Hinckley's representations to Plaintiffs that the Vessel's hull was covered by a lifetime Hull Warranty against defects in materials and workmanship constituted an express warranty within the meaning of R.I. Gen. Laws § 6A-2-313, which became part of the basis of the parties' bargain.

70. The Vessel's hull suffers from a defect in materials and/or workmanship, in that it has permitted, and continues to be susceptible to, water intrusion into the laminate and core structure, in breach of the Hull Warranty.

71. Separately and independently, Section 12 of the Terms and Conditions incorporated into the Purchase Agreement provides that Hinckley expressly warrants that the Vessel conforms, in all material respects, to the Standard Specifications.

72. The Standard Equipment List attached to and incorporated into the Purchase Agreement specifies that the Vessel's hull is of carbon construction with a Corecell M foam core, infused and post-cured with epoxy resin using the Seaman Composite Resin Infusion Molding Process.

73. The Vessel does not conform in all material respects to those Standard Specifications, in that the hull's foam core has admitted and retained water and remains water-stained and structurally degraded, and the carbon-fiber laminate in the forward bilge contains voids and air pockets.

74. Hinckley's express warranty that the Vessel conforms in all material respects to the Standard Specifications is an express warranty within the meaning of R.I. Gen. Laws § 6A-2-313 which became part of the basis of the parties' bargain, and is separate from and additional to the Hull Warranty.

75. Pursuant to R.I. Gen. Laws § 6A-2-329(3)(a), because Hinckley's Hull Warranty was given in connection with the sale of new consumer goods, Hinckley could not and did not effectively disclaim the implied warranty of merchantability described in Count III below.

76. The sale of the Vessel was a "consumer sale" within the meaning of R.I. Gen. Laws § 6A-2-329(1)(a), in that the Vessel consisted of new goods purchased primarily for personal and family purposes and not for business purposes.

77. The Hull Warranty purports to limit Hinckley's sole obligation to the repair or replacement, at Hinckley's sole election, of defective materials or workmanship, and purports to make the right to repair or replacement the boat owner's sole remedy.

78. That limited remedy failed of its essential purpose. The essential purpose of a repair-or-replace remedy is to place conforming goods in the hands of the buyer. Hinckley was afforded more than four months and repeated opportunities to repair the hull defect at its own facility, and was unable or unwilling to do so. The Vessel's hull remains defective, retaining an area of water-stained and structurally degraded core material and unrepaired bilge voids.

79. Because the limited remedy failed of its essential purpose, Plaintiffs may pursue any remedy provided by Title 6A of the Rhode Island General Laws, pursuant to R.I. Gen. Laws § 6A-2-719(2), including the recovery of incidental and consequential damages.

80. As a direct and proximate result of Hinckley's breach of the Hull Warranty, Plaintiffs have suffered damages, including but not limited to the diminished value of the Vessel, lost use of the Vessel, the loss of a pending sale of the Vessel, storage and repair-related expenses, and other incidental and consequential damages, in an amount to be determined at trial.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (R.I. Gen. Laws § 6A-2-314)
## (By Both Plaintiffs Against Defendant)

81. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

82. Hinckley is a merchant with respect to vessels of the kind sold to Plaintiffs, and the sale of the Vessel to Plaintiffs was subject to an implied warranty of merchantability pursuant to R.I. Gen. Laws § 6A-2-314.

83. The Vessel, as sold and delivered, was not fit for the ordinary purposes for which such vessels are used—namely, safe and seaworthy recreational boating—by reason of the hull defect described above.

84. As a direct and proximate result of Hinckley's breach of the implied warranty of merchantability, Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT IV**
**REVOCATION OF ACCEPTANCE / RESCISSION**
**(R.I. Gen. Laws §§ 6A-2-608, 6A-2-711)**
**(By Plaintiff Mamalilli, LLC Against Defendant)**

85. Mamalilli repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

86. The hull defect described above substantially impairs the value of the Vessel to Mamalilli.

87. Mamalilli, as the buyer of the Vessel, accepted the Vessel on the reasonable assumption that any nonconformity would be cured, and/or without discovery of the nonconformity, given the difficulty of discovering a latent hull-lamination defect before acceptance and Hinckley's assurances regarding the Vessel's condition and the Hull Warranty.

88. Mamalilli revoked its acceptance of the Vessel within a reasonable time after discovery of the defect by delivering to Hinckley the written notice of revocation described in Paragraph 55 above, and no substantial change in the Vessel's condition not caused by the defect itself has occurred.

89. Any period between Mamalilli's discovery of the hull defect in March 2026 and its revocation is attributable to Hinckley's continuing efforts to repair the Vessel and to Hinckley's repeated assurances that the defect could and would be cured under the Hull Warranty, upon which Mamalilli relied.

90. Pursuant to R.I. Gen. Laws § 6A-2-608, Mamalilli is entitled to revoke its acceptance of the Vessel, and pursuant to R.I. Gen. Laws § 6A-2-711, Mamalilli is entitled to cancel the sale, recover the full purchase price of $1,675,910 paid to Hinckley, and recover incidental and consequential damages, and Mamalilli is entitled to a security interest in the Vessel for the amount of the price paid and any expenses reasonably incurred in its inspection, receipt, transportation, and care and custody.

## COUNT V
## BREACH OF THE MARITIME IMPLIED WARRANTY OF WORKMANLIKE PERFORMANCE
## (By Plaintiff Mamalilli, LLC Against Defendant)

91. Mamalilli repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

92. Hinckley held itself out as competent to diagnose and repair the hull defect and undertook that work for Mamalilli, the Vessel's owner, and in doing so impliedly warranted to Mamalilli that its repair work would be performed in a workmanlike manner.

93. That warranty arises under the general maritime law and requires a ship repairer to exercise "the degree of diligence, attention and skill adequate to complete the task." *La Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico, Inc.*, 124 F.3d 10, 19 (1st Cir. 1997).

94. Hinckley breached that implied warranty by, among other things, failing over a period of more than four months to identify and remediate the full extent of the moisture intrusion in the hull; failing to repair the carbon-fiber bilge voids identified as early as April 2026; and

otherwise failing to perform the repair work in a manner consistent with prevailing industry standards for hull repair.

95. Hinckley's failures caused the Vessel's continuing defective condition: the repair methods Hinckley elected—repeated vacuum dewatering and drying, rather than replacement of the affected core—did not and could not restore the compromised core, with the result that the Vessel's hull, after more than four months in Hinckley's possession, retains an area of water-stained and structurally degraded core material and unrepaired bilge voids.

96. As a direct and proximate result of Hinckley's breach of the implied warranty of workmanlike performance, Mamalilli has suffered damages, including the continued diminished value and impaired seaworthiness of the Vessel, lost use, and incidental and consequential damages, in an amount to be determined at trial.

**COUNT VI**
**UNJUST ENRICHMENT**
**(By Both Plaintiffs Against Defendant)**

97. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

98. Plaintiffs conferred a benefit on Hinckley in the amount of $1,675,910 paid for the Vessel.

99. Hinckley has appreciated and retained that benefit while failing to deliver a vessel conforming to the Hull Warranty and applicable implied warranties.

100. It would be inequitable for Hinckley to retain the full purchase price paid by Plaintiffs without either curing the hull defect or refunding the purchase price, and Hinckley has been unjustly enriched in an amount to be determined at trial.

101. This Count is pled in the alternative to Plaintiffs' warranty and revocation claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant as follows:

a. Awarding Plaintiffs damages, rescission, and/or refund of the purchase price, together with reasonable attorneys' fees and costs, pursuant to the Magnuson-Moss Warranty Act, as set forth in Count I;

b. Awarding Plaintiffs damages for breach of express and implied warranty as set forth in Counts II and III;

c. Awarding Plaintiff Mamalilli, LLC revocation of its acceptance of the Vessel pursuant to R.I. Gen. Laws § 6A-2-608 and, pursuant to R.I. Gen. Laws § 6A-2-711, cancellation of the sale, recovery of the full purchase price of $1,675,910, incidental and consequential damages, and a security interest in the Vessel for so much of the price as has been paid and for expenses reasonably incurred in its inspection, receipt, transportation, and care and custody, as set forth in Count IV;

d. Awarding Plaintiff Mamalilli, LLC damages for breach of the maritime implied warranty of workmanlike performance, as set forth in Count V;

e. Awarding Plaintiffs damages for unjust enrichment, as set forth in Count VI, to the extent not duplicative of relief awarded on other Counts;

f. Awarding Plaintiffs pre-judgment and post-judgment interest;

g. Awarding Plaintiffs their costs of suit; and

h. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

Dated: September 3, 2026

Plaintiffs,
ROBERT R. MEHDIZADEH and
MAMALILLI, LLC,
By their attorneys,

/s Joshua S. Parks
Joshua S. Parks (#9782)
Colten H. Erickson (#10738)
ADLER POLLOCK & SHEEHAN P.C.
49 Bellevue Ave.
Newport, RI 02840
Tel: (401) 274-7200
Fax: (401) 351-4607
jparks@apslaw.com
cerickson@apslaw.com